# United States District Court

# Eastern District of New York

| | | |
|---|---|---|
| Changhe Cheng, | *Plaintiff,* | |
| -*against*- | | No. 1:25-cv-03286-HG-JRC |
| Flushing Hospital and Medical Center, City of New York, Dajin Realty, Inc. and NYPD Officers John Does 1-5, | *Defendants.* | |

# FIRST AMENDED COMPLAINT

*Jury Trial Demanded*

/s/ Changhe Cheng (*Pro Se*)

140-22 45th Ave, FL2, Flushing, NY 11355

Phone: 212-222-6688

Email: lingxi@gmail.com

# TABLE OF CONTENTS

*JURISDICTION AND VENUE* ................................................................................ *1*

*PARTIES* .............................................................................................................. *2*

*STATEMENT OF FACTS* ....................................................................................... *3*

*CAUSES OF ACTION* ......................................................................................... *12*

    COUNT I: UNLAWFUL ENTRY UNDER 42 U.S.C. § 1983 ................................. 12

    COUNT II: FALSE ARREST / UNLAWFUL SEIZURE UNDER 42 U.S.C. § 1983 ....... 13

    COUNT III: EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 ............................... 14

    COUNT IV: FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983 ....................... 14

    COUNT V: MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983 ..................... 15

    COUNT VI: MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983 (Monell Claim) ........... 16

    COUNT VII: ASSAULT AND BATTERY (STATE LAW) ..................................... 17

    COUNT VIII: MEDICAL MALPRACTICE ....................................................... 17

    COUNT IX: BREACH OF FIDUCIARY DUTY .................................................. 18

    COUNT X: MALICIOUS PROSECUTION ........................................................ 19

*PRAYER FOR RELIEF* ....................................................................................... *19*

# JURISDICTION AND VENUE

1       This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

("Federal Question Jurisdiction") because Plaintiff's claims for false arrest, malicious

prosecution, excessive force, and municipal liability arise under the Constitution and laws of the

United States, specifically 42 U.S.C. § 1983.

2       This Court has supplemental jurisdiction over Plaintiff's state-law claims against all

Defendants, including but not limited to medical malpractice, breach of fiduciary duty, wrongful

eviction, and malicious prosecution under New York law, pursuant to 28 U.S.C. § 1367. These

state-law claims are so related to the federal claims that they form part of the same case or

controversy, as they all arise from the same common nucleus of operative facts surrounding the

events of March 2024.

3       Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)

because a substantial part of the events or omissions giving rise to the claims occurred within this

judicial district, specifically in Queens County, New York.

4       Plaintiff has served a Notice of Claim upon the City of New York in accordance with

General Municipal Law § 50-e. The 50-h hearing was conducted on October 11, 2024. More than

thirty (30) days have elapsed since the service of said Notice of Claim, and the City has not

adjusted or settled Plaintiff's claims. Plaintiff has therefore satisfied all statutory conditions

precedent to commencing this action against the City of New York, including the

commencement of this action within one year and ninety days of the claim's accrual, as required

by General Municipal Law § 50-i.

# PARTIES

5       Plaintiff Changhe Cheng is a 71-year-old individual, with multiple disabilities and receiving home care, previously residing at 132-31 41st Ave, Flushing, NY 11355, and now residing at 140-22 45th Ave, 2nd Fl, Flushing, NY 11355.

6       Defendant City of New York: The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. The New York City Police Department (NYPD) is an agency of the City of New York. The City, through the NYPD, is responsible for the hiring, training, supervision, and conduct of its police officers. At all relevant times, NYPD officers involved in the events described below were employees of the City of New York acting within the scope of their employment and under color of state law. The City of New York is a proper defendant for the federal claims under 42 U.S.C. § 1983 (to the extent that the officers' actions were taken pursuant to municipal policy or due to a failure to train or supervise) and for the state-law claims under principles of *respondeat superior*.

7       Defendant Flushing Hospital Medical Center ("Flushing Hospital") is a hospital and medical facility located at 4500 Parsons Boulevard in Flushing, Queens, New York. Flushing Hospital is a not-for-profit medical provider licensed in New York State and is capable of suing or being sued in its own name. At all relevant times, Flushing Hospital, through its doctors, nurses, and other staff, provided medical services to Plaintiff. Flushing Hospital and its employees were responsible for treating Plaintiff in accordance with accepted medical standards and for maintaining the confidentiality of Plaintiff's medical information.

8       Defendant Dajin Realty, Inc. is a domestic corporation organized and existing under the laws of the State of New York, with its principal place of business located at 132-31 41st Ave,

2

Basement, Flushing, Queens County, NY 11355. It owns and operates the multi-unit residential property at 132-31 41st Ave, Flushing, NY 11355.

9       Plaintiff also brings this action against NYPD Officers John Doe 1-5, the true names and badge numbers of whom are presently unknown to Plaintiff. These "John Doe" Defendants are the individual NYPD officers who, acting under color of state law, participated in the unlawful entry, false arrest, malicious prosecution, use of excessive force, and failure to intervene as described herein. Plaintiff will amend this Complaint to state their true names and capacities upon ascertaining them through discovery.

# STATEMENT OF FACTS

*Landlord Refuses Judgment Payment and Illegally Evicts Tenants*

10      Since January 2013, Plaintiff Changhe Cheng and his friends and family have maintained lawful tenancy at 132-31 41st Ave, FL2, Flushing, NY 11355. Throughout this period, Plaintiff has consistently fulfilled his tenancy obligations. The events of March 2024 were the culmination of a multi-year legal dispute characterized by Defendant Dajin Realty's pattern of malicious conduct and litigation abuse. This pattern was established in early 2019 when Dajin's agents intentionally cut the building's doorbell wires, an act of sabotage that later had tragic consequences, severely delaying first responders from reaching Plaintiff's ailing sister and contributing to her death. Following this tragedy, Dajin initiated a campaign to dispossess the tenants. After its first lawsuit was defeated on August 28, 2019, with the Queens Housing Court explicitly confirming the validity of the tenants' lease and dismissing landlord's nonpayment cause of action, Dajin immediately commenced a second, duplicative lawsuit in defiance of the first judgment. This second proceeding was tainted by further procedural misconduct, including transferring the case to the Bronx County Housing Court, which lacked jurisdiction to issue three

critical orders over the Queens-based property, and Dajin's acceptance of approximately $80,000 in ERAP funds—which legally barred eviction for one year—only to continue eviction efforts in direct violation of that statutory mandate.

11      This extensive history of misconduct provides the crucial context for Plaintiff's arrest. On March 6, 2024, at 9:30 AM, when a City Marshal arrived to execute an eviction warrant, Plaintiff attempted to tender a cashier's check for $68,963.00, representing the full judgment amount. The landlord once again refused to accept the payment and discarded the check on the ground, an act that was captured on video. The cashier's check was provided by Aixiang Kong, a recent tenant, on behalf of her ex-husband. The Marshal, asserting that the landlord's refusal to accept the full judgment amount and their insistence on proceeding with the eviction was in direct violation of the relevant laws, promptly left the scene within 15 minutes without evicting the tenants or removing their belongings.

12      In the absence of law enforcement officers, the Landlord, through its agents, persisted in an illegal lockout by changing the locks to the second and third floors, as well as the main entrance. During this chaotic event, Plaintiff was pursued and pushed by the Landlord's personnel. In a subsequent dispute with the locksmith hired by the landlord, the locksmith, in an act of retaliation, deliberately slammed a half-open door on Plaintiff's hand as it rested on the doorframe. This act crushed Plaintiff's hand, directly causing a severe fracture to a finger on his right hand. The fracture was confirmed by an X-ray at the hospital later that evening, and Plaintiff immediately sent a protest via text message to the Landlord's manager, holding the Landlord responsible for the injury caused during the illegal eviction process they initiated.

13      On March 11, at approximately 4:00 PM, the landlord's representative signed for the bank cashier's check in the presence of the mail carrier and subsequently cashed it several days later. Following this, tenant Changhe Cheng sent a message (evidence) to the landlord's manager

4

demanding the prompt delivery of the replacement door keys. When a group of tenants arrived at the second-floor hallway, they discovered the main door was still securely locked. The tenants immediately called the police and a locksmith for service. Subsequently, the landlord and the landlord's manager took the inexplicable and malicious step of making a knowingly false police report alleging Plaintiff was criminally trespassing in his own home.

*Police Response and Arrests at the Property*

14      In response to the calls, officers from the NYPD's 109th Precinct arrived at the property but initially took no action. The plaintiff, with the locksmith's help, gained lawful entry to their residence and began preparing a meal. Suddenly, approximately five police officers burst into the apartment without permission or a warrant.

15      Before making any arrests, the police officers listened as the tenants explained the situation. The tenants presented the officers with: a) Multiple forms of documentation showing Plaintiff's long-term tenancy at the premises, including original and renewal lease agreements; b) The bank-certified check fully satisfying the judgment; c) Clear evidence showing the landlord's acceptance and signing for this payment earlier that day; and d) Physical evidence that his personal belongings remained in the apartment and that no lawful eviction had been completed by a City Marshal. Despite this clear and comprehensive evidence negating probable cause, the officers refused to act, stating that the decision to release or arrest depended entirely on their supervisor's determination after a consultation with legal counsel. During this extended period, Plaintiff and his son provided a detailed chronological explanation of the entire situation since 2019. Officers took away the documents and repeatedly stated that the decision to release or arrest solely depended on their supervisor's determination after consultation with legal counsel.

16      Despite this clear and comprehensive evidence negating probable cause for arrest, and after over an hour of repeated inquiries, discussion and verification of the evidence presented by

plaintiff, the police received a phone call and decided to arrest Plaintiff and his family, forcibly pushing them out of their home. During the arrest, the officers used excessive and malicious force. Despite Changhe Cheng's desperate plea, "I cannot walk far," a Korean police officer forcibly seized the cane from the disabled elderly man and threw it into a trash can in the corner of the hallway. This act caused further injury to Mr. Cheng's already fractured finger and subjected him to excruciating pain. Simultaneously, an African-American officer and a White officer assaulted the severely disabled elderly woman, Aixiang Kong, who was trapped in her wheelchair in the narrow space between the inner and outer doors, causing her bone fracture and screaming in pain. Only after the protest of her caregiver, Lingxi Kong, did the police abandon the arrest of Ms. Kong, who subsequently received medical examinations and long-term physical therapy.

17    It was only later that Plaintiff learned he was being charged with Criminal Trespass in the Second Degree. Upon information and belief, this specific charge was deliberately and fraudulently chosen to create a misleading narrative that the encounter occurred in a common area or yard, thereby concealing the officers' own, more serious crime of unlawfully entering a private dwelling while residents were present. The charge was a pretext designed to cover up the fact that the police themselves were the initial and primary trespassers, arresting the tenants for criminal trespass from the premises that the police knew to be the tenants' own home.

*Detention and Medical Treatment at Precinct and Hospital*

18    On the evening of March 11, around 10 PM, Mr. Cheng, who was being detained in a small cell at the 109th Precinct, repeatedly protested, stating, "I have a lease and just paid $70,000. How did I become an invader of my own residence?" However, his pleas were ignored. He repeatedly emphasized that he was a disabled person requiring home care, unable to stand, and suffering from severe finger pain that necessitated hospital treatment. Through Lingxi

6

Kong's negotiation, he was eventually sent to Flushing Hospital by the 109th Precinct, accompanied by a Korean police officer.

19      Upon examination, Mr. Cheng's blood pressure was found to be over 200, and X-rays revealed new injuries. As the landlord had prevented him from returning home to retrieve his medication, his prostate was swollen and painful, his bladder was swollen, and he couldn't urinate normally. Despite his repeated requests to police officers and passing doctors for medication to lower his blood pressure and alleviate pain, he was denied. He watched helplessly as the clock on the wall ticked mercilessly, enduring nearly an hour of agony before a nurse finally brought medication.

20      The White police officer who replaced the Korean officer coerced medical staff at Flushing Hospital into prematurely discharging Plaintiff, and the hospital staff unethically complied with this coercion to assist the officer. Despite Plaintiff's documented and dangerously high blood pressure of 191 and his inability to walk, police, with the hospital's active cooperation, forcibly removed him from his hospital bed and returned him to the small cell at the 109th Precinct. He was deprived of the treatment a prisoner of war should receive under the 1949 Geneva Conventions. This was done to conceal the police misconduct and the severity of Plaintiff's condition. The White officer then abruptly demanded Mr. Cheng's medical records, which he refused, concealing them between his socks and the sole of his foot. After a fruitless search, a Chinese-speaking officer instructed Mr. Cheng to hold on so he could see a judge soon.

*Transportation and Treatment at Detention Center*

21      The White officer then handcuffed Mr. Cheng's hands behind his back extremely tightly and chained this elderly man with a fractured finger together with five others on a short iron chain, making it impossible to move or sit together. During the ride, Mr. Cheng's entire wrist and fingers gradually went numb, losing the sensation of pain. After being registered and

photographed at the detention center (evidence: first detention form), he was nearly unable to stand due to dizziness. The detention center doctor asked him to read a paper with rules, but he couldn't see clearly. He kept tapping the table with his numb hands, indicating he had no sensation of pain and couldn't answer the level of pain. As he failed to pass checks like blood pressure measurement, he was sent back for medical treatment.

22      The White officer, visibly angry, roughly handcuffed Mr. Cheng extremely tightly again and pushed him forcefully. Instead of taking him to the hospital, the officer took him directly back to the 109th Precinct. Mr. Cheng realized they were searching for the first medical record he had refused to hand over, as it proved the police had failed to provide him with proper treatment worse than a prisoner of war and were suspected of abuse. Only after repeated fruitless searches did the White officer handcuff Mr. Cheng and send him back to Flushing Hospital once more.

23      Upon return to Flushing Hospital under police escort, Mr. Cheng faced a pattern of unprofessional treatment from medical staff. The attending physician, after consulting with the White officer, criticized Mr. Cheng rather than addressing his medical needs, stating that his issues required a judge's intervention rather than hospitalization.

24      Mr. Cheng had gone approximately 36 hours without food, from 5 PM on the 10th until the early morning of the 12th. Despite repeatedly expressing his severe hunger and need for nourishment, medical staff responded with sarcasm and dismissive comments, stating that only medication could be provided. However, the hospital failed to provide either food or medicine.

25      The situation became critical when Mr. Cheng showed clear signs of severe dehydration, with white corners appearing around his mouth and difficulty speaking. Only then did a nurse provide two thin slices of bread with butter. In his weakened state, Mr. Cheng began choking while attempting to eat, unable to swallow properly and struggling to breathe. Throughout this

medical emergency, both the medical staff and the White officer displayed deliberate indifference, with the officer notably occupied with his phone while Mr. Cheng struggled for breath.

26      The medical staff's conduct was characterized by inappropriate comments about Mr. Cheng's condition in front of law enforcement officers, deliberate delays in providing water despite obvious dehydration, and a general disregard for his urgent medical needs. Despite Mr. Cheng's pleas for humane treatment and warnings about his deteriorating condition, his requests were largely ignored, potentially putting his life at risk.

27      Realizing he had to survive, Mr. Cheng waited an unknown amount of time until someone brought water. He only drank a little to guard against choking to death. At this point, two more officers appeared briefly and disappeared, instead of immediately replacing the discriminative White officer.  Mr. Cheng quickly deduced that the officers believed the medical records he had hidden couldn't be found after multiple searches and might have been flushed down the toilet. So they went behind his back to find the doctor and secretly made a copy of his first medical record, then found an opportunity to quietly return it to him at the last moment.

28      During this second hospital visit, multiple serious violations of patient privacy and medical ethics occurred: a) Hospital staff unlawfully disclosed Plaintiff's confidential medical information to police officers without obtaining required consent or authorization; b) Officers were permitted unauthorized access to examine and copy medical records without patient notification or approval; c) Staff failed to document numerous obvious signs of physical distress and injury, particularly those related to law enforcement restraint; d) Medical personnel omitted key information about the cause and nature of injuries from official records; e) Hospital staff engaged in inappropriate discussions about Plaintiff's medical condition with law enforcement

personnel; f) Plaintiff was discharged prematurely for the second time despite documented

serious medical concerns and without proper discharge protocols being followed.

*Continued Mistreatment at Precinct*

29      Around noon on March 12, Mr. Cheng was returned to a holding cell at the 109th

Precinct in a severely weakened state, having been deprived of food for approximately 43 hours.

His physical condition had deteriorated significantly, manifesting in dizziness, severe abdominal

pain, sustained muscle spasms, and continuous dry heaving. The situation was exacerbated by a

non-functional water faucet in the cell, leaving him without access to drinking water. His

desperate attempts to find alternative water sources, including considering the cell's toilet,

proved unsuccessful.

30      During a cell check, a female officer demonstrated notable indifference to Mr. Cheng's

serious medical situation. When he reported his prolonged food deprivation, she responded

dismissively, asking if he had money. Despite Mr. Cheng confirming he had $100 in his

possession and requesting assistance with ordering food, the officer engaged in deceptive

behavior - pretending to take out her phone to help before walking away without taking any

action. This interaction reflected a broader pattern of intentional disregard for proper detention

protocols and basic humanitarian care.

31      Relief came only around 4 PM, which is approximately 46 hours from Cheng's last food

intake, when several newly arrested Chinese detainees also demanded food. At this point, Mr.

Cheng finally received a portion of food and a small cup of water, though the amount was

insufficient given his severe state of deprivation.

32      Around 6 PM, as Mr. Cheng was being transferred from the 109th Precinct back to the

detention center, officers placed a set of documents into his pocket while he was still handcuffed.

After he was placed into a holding cell at the detention center, he was able to inspect the papers.

He discovered that among them was the very medical record the police had illicitly obtained from the hospital—the official copy bearing his signature. This was the document he had seen the police trying to find, which they likely presumed he had flushed down a toilet.

*Medical Records and Documentation Issues*

33    During Mr. Cheng's court appearance on March 12, 2024, the prosecution, relying on information from the arresting officers, withheld critical exculpatory information from the judge. Most significantly, the court was never informed that Plaintiff had tendered, and the Landlord had accepted, full payment of the $68,963 judgment just hours before the arrest. The judge, noting a recent pattern of criminal cases arising from landlord-tenant civil disputes, declined to issue a protective order against Mr. Cheng.

34    A subsequent, careful comparison of the medical records in Plaintiff's possession provides irrefutable proof of a coordinated conspiracy between Flushing Hospital and the police. Plaintiff retained the original, unsigned patient copy of his first medical record, which he had hidden in his shoe. The second version—the official, signed copy from the hospital's file—was the one police surreptitiously obtained and later slipped into his pocket. The discrepancy between the unsigned patient copy and the signed official copy is direct evidence that hospital staff colluded with police, allowing them to illicitly copy the confidential record after it was signed and without Plaintiff's consent. To preserve this chain of evidence, Plaintiff deliberately did not request his own records from the hospital, ensuring that the only way he could possess the signed, official copy was through the police's illegal actions. This was further confirmed when a later formal request for records yielded only a disc of old, irrelevant X-rays, not the treatment notes from the incident, evidencing a continued effort to conceal their joint misconduct.

11

*Aftermath and Ongoing Medical Issues*

35      The incident resulted in severe and ongoing health consequences. On March 13, Mr.

Cheng experienced total physical exhaustion and debilitating pain, requiring complete bed rest.

Beginning March 14, he sought treatment from a rehabilitation doctor for nerve damage in his

left wrist and thumb, caused by the excessively tight handcuffs. Despite completing over ten

acupuncture sessions and forty physical therapy sessions, he continues to experience persistent

numbness and limited mobility. His fingers are now permanently deformed and cannot be

restored to their original state. Medical professionals have confirmed the permanent nature of the

nerve damage and deformity.

36      The case concluded favorably for Mr. Cheng when all criminal charges were dismissed

on June 18, 2024. Subsequently, a notice of claim was filed with the Comptroller's Office on July

3, 2024, and a 50-H hearing was conducted on October 11, 2024, satisfying jurisdictional

requirements.

# CAUSES OF ACTION

## *-- CLAIMS AGAINST DEFENDANT CITY OF NEW YORK AND JOHN DOE OFFICERS -*
## COUNT I: UNLAWFUL ENTRY UNDER 42 U.S.C. § 1983

*(Against Defendants NYPD Officers John Does 1-5)*

37      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

38      The Fourth Amendment to the United States Constitution protects individuals from

unreasonable searches, and its protections are at their highest when a person is inside their own

home.

12

39     On March 11, 2024, Defendants NYPD Officers John Does 1-5, acting under color of state law, unlawfully entered Plaintiff's private residence at 132-31 41st Ave without a warrant, without consent, and without any exigent circumstances that would justify a warrantless entry.

40     This unconstitutional intrusion occurred before any arrest was made and constituted an independent violation of Plaintiff's clearly established constitutional rights. The officers' subsequent decision to arrest Plaintiff was, upon information and belief, motivated in part to retroactively justify their own prior illegal entry.

41     As a direct result of this unlawful entry, Plaintiff suffered a profound violation of his privacy and security, as well as fear, humiliation, and emotional distress.

## COUNT II: FALSE ARREST / UNLAWFUL SEIZURE UNDER 42 U.S.C. § 1983

*(Against Defendants NYPD Officers John Does 1-5)*

42     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

43     Defendants NYPD Officers John Does 1-5, acting under color of state law, subjected Plaintiff to an unreasonable seizure in violation of the Fourth and Fourteenth Amendments by arresting and detaining him without a warrant or probable cause.

44     The absence of probable cause was absolute and undeniable. Prior to making any arrest, during a period of calm negotiation, the officers were presented with irrefutable documentary and video evidence establishing Plaintiff's lawful right to occupy the premises. Their decision to arrest Plaintiff for trespassing was made in deliberate and conscious disregard of this dispositive evidence, only after receiving instruction from a supervisor.

45     No objectively reasonable police officer could have believed that probable cause existed

to make an arrest. The actions of Defendants John Does 1-5 were therefore objectively

unreasonable and are not protected by qualified immunity.

46     As a direct result of this unlawful arrest, Plaintiff was deprived of his liberty, suffered

physical injury, and endured humiliation and emotional distress.

## COUNT III: EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

*(Against Defendants NYPD Officers John Does 1-5)*

47     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

48     In the course of arresting Plaintiff, Defendants NYPD Officers John Does 1-5 used a

degree of force that was objectively unreasonable and excessive in violation of the Fourth and

Fourteenth Amendments.

49     The use of force was objectively unreasonable because it was directed at a non-violent,

non-resisting, elderly, and disabled individual. Specifically, the officers (a) forcibly seized

Plaintiff's medical cane, (b) applied handcuffs with excessive tightness onto his known fractured

finger, causing extreme pain and permanent nerve damage, and (c) chained him to other

detainees on a short chain, making movement impossible and exacerbating his injuries.

50     No reasonable officer would believe that such force was necessary or lawful when

applied to a compliant, elderly individual with known physical vulnerabilities.

51     As a direct result of this excessive force, Plaintiff suffered excruciating pain and

sustained severe, permanent physical injuries, including the deformity of his fingers.

## COUNT IV: FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983

*(Against Defendants NYPD Officers John Does 1-5)*

52     Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

53      It is clearly established law that a police officer has an affirmative duty to intervene to protect the constitutional rights of a citizen from infringement by other officers in their presence.

54      On March 11, 2024, multiple Defendants from the group of John Does 1-5 were present and observed other officers commit unconstitutional acts, including but not limited to: (a) unlawfully entering Plaintiff's home; (b) using excessive force against Plaintiff; and (c) assaulting the disabled, elderly woman Aixiang Kong.

55      Each officer who was present and had a realistic opportunity to intervene but failed to do so is liable for the harm that they could have prevented.

56      As a direct result of the officers' failure to intervene, Plaintiff suffered unlawful entry, false arrest, and excessive force, resulting in physical injury, permanent deformity, and severe emotional distress.

# COUNT V: MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

*(Against Defendants NYPD Officers John Does 1-5)*

57      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

58      After unlawfully arresting Plaintiff, Defendants NYPD Officers John Does 1-5 initiated a criminal proceeding against him by filing a criminal complaint containing false allegations, thereby violating his rights under the Fourth and Fourteenth Amendments.

59      This proceeding was initiated without probable cause and with actual malice. The officers' malice is evidenced by their decision to pursue criminal charges against Plaintiff for trespassing in order to conceal and retroactively justify their own prior unlawful, warrantless entry into his home.

60      The proceeding was terminated in Plaintiff's favor on June 18, 2024, when all charges were dismissed.

15

61      As a direct result of this malicious prosecution, Plaintiff was forced to endure the anxiety

and stigma of a criminal proceeding, appear in court, and suffer a continued deprivation of

liberty.

# COUNT VI: MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983
# (Monell Claim)

*(Against Defendant City of New York)*

62      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

63      The unconstitutional acts of the John Doe officers described above were the direct result

of the official policies and customs of the Defendant City of New York.

64      First, the decision to arrest Plaintiff was an officially sanctioned action. The arresting

officers, faced with dispositive exculpatory evidence, explicitly stated that they would not act

until they consulted with and received approval from an NYPD supervisor. This deliberate, high-

level decision to proceed with a baseless arrest constitutes an official, ad hoc policy decision by

an authorized municipal policymaker, making the City directly liable.

65      Second, the City of New York is liable for maintaining widespread and persistent

customs that were the moving force behind the violations, including: (a) the systematic practice

of making baseless criminal arrests to resolve civil landlord-tenant disputes; (b) the systematic

failure of officers to intervene to prevent constitutional violations by their peers; and (c) the

systematic failure to provide adequate food, water, and medical care to detainees.

66      The City has demonstrated deliberate indifference to the constitutional rights of its

citizens by failing to adequately train, supervise, or discipline its officers regarding these known,

recurring problems, thereby ratifying the misconduct.

## COUNT VII: ASSAULT AND BATTERY (STATE LAW)

67      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

68      At all relevant times, Defendants NYPD Officers John Does 1-5, in the course of arresting Plaintiff, intentionally made physical contact with Plaintiff that was harmful, offensive, and without his consent.

69      This conduct constituted assault and battery under the common law of the State of New York. Specifically, the officers' actions included but were not limited to: (a) forcibly seizing Plaintiff's medical cane; (b) applying handcuffs with excessive tightness onto his known fractured finger, causing extreme pain and permanent nerve damage; and (c) physically pushing and shoving Plaintiff.

70      These intentional acts were the direct and proximate cause of Plaintiff's physical injuries, permanent deformity, pain and suffering, and emotional distress.

71      At all times relevant, Defendants John Does 1-5 were employed as police officers by the City of New York and were acting within the scope of their employment. Pursuant to the doctrine of respondeat superior, Defendant City of New York is therefore vicariously liable for the tortious acts of its employees.

72      Plaintiff has complied with all conditions precedent to filing this claim, including the timely service of a Notice of Claim pursuant to New York General Municipal Law § 50-e and participation in a hearing pursuant to § 50-h.

### *--- CLAIMS AGAINST DEFENDANT FLUSHING HOSPITAL ---*
## COUNT VIII: MEDICAL MALPRACTICE

73      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

17

74      Defendant Flushing Hospital, by and through its staff, owed Plaintiff a duty to provide

medical care that complied with good and accepted standards of medical practice in New York.

75      Flushing Hospital repeatedly and egregiously breached this duty. These departures from

the standard of care include, but are not limited to: (a) deliberately withholding food and water

for approximately 46 hours; (b) providing food that presented a choking hazard and then

displaying deliberate indifference while Plaintiff choked; (c) failing to administer necessary

medication for Plaintiff's documented, dangerously high blood pressure; and (d) twice

discharging Plaintiff prematurely while he was medically unstable, at the behest of police.

76      These acts and omissions were a direct and proximate cause of the exacerbation of

Plaintiff's injuries, his permanent nerve damage, and his extreme pain and suffering.

## COUNT IX: BREACH OF FIDUCIARY DUTY

77      Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

78      As Plaintiff's medical provider, Defendant Flushing Hospital owed him fiduciary duties

of loyalty and confidentiality.

79      Flushing Hospital intentionally breached these duties by substituting the judgment of law

enforcement for its own independent medical judgment, prioritizing the police's non-medical

goals of custody and control over its fiduciary duties of loyalty and care to Plaintiff. This breach

is evidenced by, among other things, the hospital's premature discharge of Plaintiff at the behest

of police despite his medically unstable condition.

80      This act of bad faith, combined with allowing police to dictate medical decisions,

constitutes a profound betrayal of the patient-provider relationship and a violation of the

hospital's duty of loyalty.

18

81    As a direct result of this breach, Plaintiff suffered severe emotional and dignitary harm from the violation of his privacy, and his physical injuries were worsened.

### --- *CLAIMS AGAINST DEFENDANT DAJIN REALTY, INC.* ---
## COUNT X: MALICIOUS PROSECUTION

82    Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

83    Defendant Dajin Realty initiated a criminal proceeding against Plaintiff by intentionally making a false report to the NYPD on March 11, 2024, for the purpose of having him arrested.

84    The Landlord acted without probable cause and with actual malice, as it made the false trespass report after a City Marshal had refused to execute the eviction and after its representative had signed for and accepted a bank check for the full judgment amount.

85    The criminal proceeding terminated entirely in Plaintiff's favor on June 18, 2024. As a direct result of the Landlord's malicious acts, Plaintiff was arrested, jailed, injured, and humiliated, and is entitled to compensatory and punitive damages.

## PRAYER FOR RELIEF

86    WHEREFORE, Plaintiff Changhe Cheng respectfully requests that this Court enter a judgment in his favor and against all Defendants, jointly and severally as applicable, for the following relief:

a)  An award of Compensatory Damages in an amount not less than Ten Million Dollars ($10,000,000) for Plaintiff's physical injuries, permanent deformity, pain and suffering, emotional distress, and the violation of his constitutional rights;

b)  An award of Punitive Damages in an amount to be determined at trial against the individual John Doe Defendants, Defendant Flushing Hospital, and Defendant Dajin Realty, Inc., sufficient to punish their malicious and willful conduct and to deter such conduct in the future;

19

c) A Declaratory Judgment that Defendants' acts violated Plaintiff's rights under the Constitution and laws of the United States and the State of New York; and

d) Any other relief the Court deems just and proper.

Respectfully submitted,                    /s/ Changhe Cheng (*Pro Se*)
Dated: June 24, 2025                        140-22 45th Ave, FL2, Flushing, NY 11355
Flushing, New York                         Phone: 212-222-6688 | Email: lingxi@gmail.com

20